J-S55030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF E.C.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.T.H., III, FATHER | No. 474 EDA 2016 |

Appeal from the Decree entered January 22, 2016,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000878-2015 &
CP-51-DP-0000604-2012.

| | |
|---|---|
| IN THE INTEREST OF C.M.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.T.H., III, FATHER | No. 476 EDA 2016 |

Appeal from the Decree entered January 22, 2016,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000879-2015 &
CP-51-DP-0001109-2012.

BEFORE: LAZARUS and DUBOW, JJ., and STEVENS, P.J.E.*

MEMORANDUM BY DUBOW, J.:                    **FILED AUGUST 02, 2016**

*Former Justice specially assigned to the Superior Court.

Appellant, J.T.H., III, ("Father") appeals from the decrees involuntarily terminating his parental rights to his two daughters, E.C.H. and C.M.H. pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a) and (b). We affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

E.C.H. was born in September 2008, and C.M.H. was born in September 2009. Father and M.Z. ("Mother") were never married. In April 2012, the children lived with Mother. Father was incarcerated at the time.

The family became known to the Philadelphia Department of Human Services ("DHS") on April 7, 2012, when St. Christopher's Hospital for Children reported that both children had multiple bruises and healing fractures, and that C.M.H.'s spine had been severed. A physician concluded that the children's injuries were inconsistent with Mother's explanations, and indicated physical abuse.[1]

Pursuant to emergency protective orders, the children were temporarily committed to DHS. DHS placed E.C.H. in foster care after her release from the hospital on April 10, 2012. C.M.H. remained in the hospital until June 26, 2012. Upon her release, DHS placed C.M.H. in the care of J.C., the children's maternal grandmother. C.M.H. has no feeling from the waist

---

[1] Mother ultimately served a term of incarceration after pleading guilty to aggravated assault and endangering the welfare of a child. She voluntarily relinquished her parental rights in September 2015.

down, has learned to walk again with braces, and requires daily catheterization and specialized bowel care.

In July 2012, the court adjudicated the children dependent, committed them to DHS, and placed them both in kinship foster care with J.C., where they have remained. The court also ordered that Father was to have supervised visits at DHS upon his release from incarceration.

Father was released from prison in October 2013 and received a Family Service Plan ("FSP"). The court held a permanency review hearing on October 29, 2013, and ordered Father to participate in caregiver meetings at the Children's Crisis Treatment Center ("CCTC") and participate in medical training to learn how to care for C.M.H. The court also referred Father for a psychological evaluation, and ordered DHS to explore supervised visits with Father by agreement of the parties.

At a March 24, 2014 permanency review hearing, the court found Father to be fully compliant with his FSP objectives. Based on concerns expressed by DHS, the court ordered Father to go to the Clinical Evaluation Unit ("CEU") for drug and alcohol monitoring, and to Behavioral Health Services ("BHS") for evaluation. The court also ordered Father to continue medical training necessary for the care of C.M.H., attend C.M.H.'s physical therapy appointments, continue therapeutic visits with both children, and attend counseling with J.C.

At each of the permanency review hearings that followed, DHS and others expressed concerns regarding Father's adherence to and participation

in court-ordered programs. In June 2014, Father's drug and alcohol treatment program reported that he had attended only two of his last ten scheduled sessions, and that he had tested positive for oxycodone on June 24, 2014. Additionally, Father consistently arrived late for C.M.H.'s physical therapy at Shriner's Hospital for Children, often left early, and did not interact much with his daughter. The Center for Families and Relationships reported in August 2014 that Father had attended twelve out of fifteen scheduled therapy sessions with J.C.

At an August 13, 2014 permanency review hearing, the court again ordered Father to CEU for drug screening and monitoring. The court also ordered Father to continue with visitation and to attend C.M.H.'s physical therapy sessions.[2] The court also ordered the Community Umbrella Agency ("CUA"), which was handling the case, to refer Father for a bonding evaluation. The bonding evaluation concluded, *inter alia*, that Father had trouble engaging with both children at once.

On November 4, 2014, the court ordered DHS to take over the case from CUA and to appoint an experienced social worker. The court again referred Father for a bonding evaluation with both children. Therapeutic visits with Father and each child continued, as did family therapy sessions with Father and J.C.

---

[2] C.M.H. refused to attend physical therapy sessions with Father alone so J.C. also attended those sessions.

At a December 15, 2014, permanency review, the court found Father fully compliant and noted that, even though the children had been in foster care for 15 of the last 22 months, reunification with Father was imminent. After learning of Father's positive drug screening, the court ordered Father to provide a release of his medical records regarding prescriptions he had received for medications. The court also ordered DHS explore increased hours for Father's visits with children.

At a permanency review hearing held on March 19, 2015, the court found Father substantially compliant, but on the recommendation of DHS, ordered him to reengage with and complete drug and alcohol treatment program, and to complete three random drug screens. After the hearing on that same date, as well as on June 4, 2015, Father tested positive for drugs in his system. On both occasions, Father's creatinine level was abnormally low, which suggested that he had attempted to dilute his urine.

At a June 11, 2015, permanency review, Father was ordered to undergo a parenting capacity evaluation, including a full psychological evaluation. Father was also ordered to take five random drug screens.

On July 25, 2015, DHS held an FSP meeting and changed the placement goal to adoption. Under the new FSP, Father's objectives were to obtain safe housing, participate in drug and alcohol treatment, consistently visit with the children, and continue to attend counselling with J.C. in order to improve their relationship.

At a September 11, 2015, permanency review hearing, the court ordered Father's supervised visits to continue. Noting that the children had been in placement for thirty-nine months, the court ordered Father to comply strictly with all visitation and therapy schedules.

In November 2015, Father underwent a parenting capacity evaluation after which the evaluator expressed concerns that Father (1) used drugs to cope with stress, (2) provided conflicting accounts of his mental health treatment, substance abuse and criminal histories; (3) inconsistently visited with the children; (4) inconsistently participated in C.M.H.'s medical appointments and mental health appointments for both children; (5) possessed limited insight into the impact on his children if they were to be removed from J.C.'s care; and (6) was unable or unwilling to engage and interact with the children during visits.

On January 4, 2016, DHS filed a Petition for the Involuntary Termination of Father's Parental Rights ("TPR petition") as to each child, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), and § 2511(b).

On January 21, 2016, and again on the next day, the Family Court held an evidentiary hearing on the TPR Petitions. The Agency presented testimony from a parenting capacity evaluator, a trauma clinician, and several caseworkers who had been assigned to the case. Father testified on his own behalf. At the conclusion of the hearing, the Family Court granted the petitions based upon Section 2511(a)(1) and (2), and Section 2511(b). This timely appeal by Father follows.

**ISSUES ON APPEAL**

Father raises the following issues on appeal:

1. Whether the [Family Court] erred and/or abused its discretion by terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) where [Father] presented evidence that he has performed his parental duties, by fulfilling his [FSP] goals and going beyond that and completing everything that was requested of him. Father was not provided with reasonable efforts to reunify with his children.

2. Whether the [Family Court] erred and/or abused its discretion by terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) where [Father] presented evidence that he has remedied his situation by meeting his goal of continuing contact with his children and completing all the has [sic] the present capacity to care for his children in his home with the help of his parents.

3. Whether the [Family Court] erred and/or abused its discretion by terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. [§] 2511(b) where evidence was presented that established [Father] and his children were never given a reasonable chance for a close bond[.] [The Agency] permitted [Maternal Grandmother] to isolate the children and undermine Father in his relationship with his children. The best interests of the children should be to incorporate [Father] and the paternal grandparents into the lives of these medically needy children.

Father's Brief at 7.

**LEGAL ANALYSIS**

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of***

**S.P.**, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** This Court may reverse a decision based on an abuse of discretion only upon demonstration of "manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** We may not reverse, however, merely because the record would support a different result." **Id.** at 827.

Appellate courts give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). The Orphans' Court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. **In re M.G.**, 855 A.2d 68, 73-74 (Pa. Super. 2004). In addition, in order to affirm the termination of parental rights, this Court need only agree with any one subsection under Section 2511(a). **See In re B.L.W.** 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citations omitted).

### Termination Pursuant to 2511(a)(1)

Section 2511(a)(1) provides that the trial court may terminate parental rights if the petitioner establishes by clear and convincing evidence that for six months, the parent demonstrated a settled intent to relinquish a parental claim or a refusal or failure to perform parental duties:

> a)    The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1)    The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. 2511(a)(1). **See In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (interpreting Section 2511(a)(1) to require petitioner to prove by clear and convincing evidence a settled intent to relinquish parental rights or a refusal or failure to perform parental duties).

This Court has defined "parental duties" in general as the obligation to provide safety, security and stability for the child affirmatively and consistently:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental

- 9 -

obligation is a positive duty which requires affirmative performance. This affirmative duty … requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.*

Moreover, a parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent child relationship:

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted).

And most importantly, "parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with her physical and emotional needs." **Id.**

In the instant case, the Family Court properly concluded that DHS met the requirements of Section 2511(a)(1). The court found that, during the relevant period prior to DHS's filing of the TPR Petitions on January 6, 2016, Father had failed to comply with court orders and to fulfill his FSP objectives of addressing his drug use, attending family therapy, consistent visitation,

and being able to perform the necessary medical procedures for C.M.H. The court explained:

> Father did not complete drug and alcohol treatment during the six-month period prior to the filing of the [TPR] petitions. He tested positive for benzodiazepines on June 5, 2016, and was ordered by the court and referred by [the Agency] to re-engage with treatment. He has not done so since June 9, 2015, meaning that he has not sought treatment once during the six-month period. This is part of a pattern stretching back beyond the relevant period, since Father was out of treatment from February 4, 2015, to March 23, 2015. Father tested positive for suboxone on November 17, 2014, and December 1, 2014. [He] tested positive for marijuana and benzodiazepines on March 19, 2015, and his creatinine level was also 27.95, indicating that Father had diluted his urine in order to fool the drug screens. Father was ordered by the [Family Court] to complete six random drug screens. Father came to court on November 3, 2015, filled out the paperwork and left without submitting a urine sample. Father submitted a fake urine sample at a December 2, 2015, drug screen. The social worker attempted to reach out to Father to return for another drug screen, but was not able to do so. Father completed zero out of six random drug screens ordered by the court. At the same time, [he] did not complete his drug and alcohol program, which was dual diagnosis. Father also was not compliant with his trauma therapy sessions, and is not a stable resource for the traumatized Children. Father stopped participating in the Children's trauma therapy. Father attended physical therapy sessions intermittently, and did not pay attention during the sessions. The hospital social worker testified credibly that Father could injure [C.M.H.] if he performed the catheterization improperly. Father testified that he was trained in the procedure, but told Dr. Williams that he had never actually performed the procedure. [C.M.H.] would not allow Father to perform the necessary procedures on her, since she does not trust him. Father is not in family therapy with the Children [and Maternal] Grandmother. Father attended only 28 of 40 scheduled visits. Over the six months prior to the filing of the [TPR petitions], Father has failed to perform key parental duties

- 11 -

by refusing to engage in drug and alcohol treatment, not meeting his FSP goals successfully and not complying with court orders. Father's behavior extends prior to the six month period, since he had failed to successfully complete a dual diagnosis drug and alcohol program, medical training and consistent visits with the Children. Father has an affirmative duty to parent. Father has failed, refused and evidenced a settled purpose of relinquishing parental claims to the Children by not performing parental duties. These facts were demonstrated by clear and convincing evidence, so the trial court did not err or abuse its discretion by terminating Father's parental rights under [Section 2511(a)(1)].

Family Court's Opinion, 3/24/16, at 7-8 (citations omitted).

Father argues that the Family Court erred in terminating his parental rights pursuant to Section 2511(a)(1) because "[t]he evidence at trial clearly demonstrated that [he] repeatedly tried to perform his parental duties but was not provided an opportunity to perform [them] because [Maternal Grandmother] was present during all contact he had with his children." Father's Brief at 11. According to Father, "Maternal Grandmother sabotaged [his] attempts to build a relationship and bond with his children." *Id.*

Our review of the record refutes these claims. Father's arguments focus on the credibility of the witnesses and we accept the Family Court's crediting the testimony of the Agency's witnesses over Father's testimony. *In re M.G.*, *supra*. Additionally, we note that Maternal Grandmother was not called to testify by any party, and there is no evidence of record to support Father's claim that she interfered with his interaction with his daughters. Indeed, the testimony would support the opposite conclusion. *See*, *e.g.*, N.T., 1/21/16, at 139 (upon cross-examination by Father's

- 12 -

counsel, foster care social worker testifies that, during Father's visits with the children, Maternal Grandmother did not interfere). Finally, the same is true with regard to the testimony of the efforts made by the Agency to obtain reunification. *See*, *e.g.,* N.T., (upon cross-examination by Father's counsel, the children's current caseworker testifies that he was 120% committed to the case and that he fought hard for reunification).

Accordingly, the Family Court did not abuse its discretion in terminating Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), and we need not consider the other basis for termination under this section. *See B.L.W.*, *supra*.

**Termination Pursuant to Section 2511(b)**

We also agree with the Orphans' Court's determination that the Agency met its burden under 23 Pa.C.S.A. §2511(b) and that terminating Father's parental rights is in the best interest of the Child.

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re: Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court found that "intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition,

the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.*

In cases where there is no evidence of a bond between a parent and a child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Thus, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

In the instant case, the Family Court relied upon the testimony of various witnesses presented by the Agency in concluding that Father misunderstands his role as a parent for his school-age daughters and that no bond exists between him and the children. In addition, the court found that the children have bonded with Maternal Grandmother, and that they would suffer irreparable harm if removed from *her* care:

> Dr. Williams testified that Father indicated that he was never engaged in family therapy with the Children, which contradicted other reports that [she] had reviewed. Father summarized his parental role as "child proofing the house" and ensuring that there were no small items on the ground for the Children to eat. This demonstrated a lack of understanding of the age-appropriate behaviors of the Children, who are six and seven years old. Father can only engage the Children one at a time, and often does not engage them at all. The Children are not excited for Father's visits, they scream and protest. The Children often express their feelings that Father is not their "daddy" and they do not want him in their lives. [C.M.H.] refuses to allow Father to perform catheterization, because she does not trust him. She also tells Father she does not love him. Father never properly learned the catheterization procedure, which [C.M.H.] needs, and could harm her if it is performed incorrectly. The [Agency] social worker

- 14 -

testified credibly that the Children know and reject Father, and would suffer no irreparable harm if his parental rights were terminated. Further, the Children's therapist testified that it would be more traumatizing than the initial trauma [suffered] by the Children if they were removed from [Maternal Grandmother]. It would be in their best interest to be adopted by [Maternal Grandmother]. The Children have no parental bond with Father. Even after Father's release from prison, Father was given the opportunity to create a bond with the Children, but he has failed to do so by not being consistent with his scheduled visits. Father attended only 28 out of 40 scheduled visits. The court heard testimony that the Children are each other's greatest emotional support, and that they would both suffer irreparable harm if separated. The Children would suffer irreparable harm if removed from [Maternal Grandmother's] care. The Children have a parent-child bond with [Maternal Grandmother], and consider her their mother. This bond helps the Children overcome their trauma. [Maternal Grandmother's] diligent care helped [C.M.H.] walk again, and [she] is present at all trauma and physical therapy sessions. [Maternal Grandmother] provides for the Children's needs, cares for them when they are sick and is involved in their school. [Maternal Grandmother] is also highly experienced at performing the medical catheterization, and is the only person [C.M.H.] will permit to perform the daily bowel procedure on her. [The Agency] has met its burden of clear and convincing evidence that termination would not destroy an existing beneficial relationship with Father; therefore, the trial court did not commit error or abuse its discretion under [Section 2511(b)].

Family Court Opinion, 3/24/160, at 11-12 (citations omitted).

Father argues that his children have never been offered the opportunity to develop a bond with him or their paternal grandparents. Father asserts that after Maternal Grandmother became the children's "sole guardian," [] the children became totally dependent upon her for everything. All contact with [his] family was halted and [he] was not permitted time

- 15 -

alone with his daughter[s]." Father's Brief at 12. According to Father, "[w]ith the physical and emotional trauma that these children suffered it would be in their best interest to have more than one person responsible for meeting all of their physical and emotional needs." *Id.* Brief at 18. Father avers that, "[h]ad [he] and his family been allowed to have contact without [Maternal Grandmother] present, there relationship could have flourished." *Id.* at 12.

Once again, the credibility of the witnesses' testimony, and the weight to be given it, are matters exclusively within the province of the Orphans' Court as fact finder. *In re M.G.*, *supra*. Additionally, we note that neither of his parents testified about their ability to care for the children. Thus, Father's claim fails.

**CONCLUSION**

In sum, our review of the record supports the Orphans' Court's determination that the Agency met its statutory burden of proving by clear and convincing evidence that Father's parental rights should be terminated pursuant to 23 Pa.C.S. §§ 2511(a)(1) and 2511(b). Accordingly, we affirm.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/2/2016</u>